J-S01021-18
J-S01022-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: J.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.L.G., MOTHER | |
| | No. 1458 MDA 2017 |

Appeal from the Order Entered August 28, 2017
In the Court of Common Pleas of York County Orphans' Court at No(s):
2017-0078

| | |
|---|---|
| IN THE INTEREST OF: J.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.L.G., MOTHER | |
| | No. 1477 MDA 2017 |

Appeal from the Order Dated August 25, 2017
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000302-2016

BEFORE:  GANTMAN, P.J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MURRAY, J.:                    **FILED FEBRUARY 22, 2018**

A.L.G. (Mother) appeals from the decree that involuntarily terminated

her parental rights to the male child, J.T.W. (Child), and the order that

changed Child's placement goal to adoption.[1] Upon careful review, we affirm the decree and order.[2, 3]

The certified record reveals the following factual and procedural history. Child was born prematurely in November of 2016. Prior to his discharge from the hospital, Child was placed in the emergency protective custody of York County Children, Youth & Families (CYF) due to allegations regarding, in part, the condition of Mother's and Father's home, and Mother's mental health diagnosis of bipolar disorder, attention deficit hyperactivity disorder, and postpartum depression. Joint Stipulation, 8/17/17, at ¶ 6-7. Moreover, Mother had a history of self-medicating with marijuana instead of using her prescribed psychotropic medication. *Id.* at ¶ 6. In addition, Mother has three older children, none of whom remained in her custody. By the time of Child's

---

[1] Mother's appeals are listed consecutively. The appeals arise from the same set of facts and procedural history. In addition, Mother raises identical issues and arguments in her appellate briefs. Therefore, we dispose of both appeals in a single adjudication.

[2] Pursuant to the Juvenile Act, 42 Pa.C.S. § 6301, *et seq.*, permanency planning for dependent children is conducted under the jurisdiction of the juvenile court. Pursuant to the Adoption Act, 23 Pa.C.S. § 2101, *et seq.*, involuntary termination of parental rights is conducted under the jurisdiction of the orphans' court. Instantly, the Honorable Kathleen J. Prendergast presided over both matters.

[3] Child's Guardian *ad litem* filed appellee briefs to this Court in support of the involuntary termination decree and goal change order.

birth, Mother had voluntarily relinquished her parental rights to one child, and her parental rights were involuntarily terminated to another.[4] *Id.*

The trial court adjudicated Child dependent on December 23, 2016. By order dated May 2, 2017, the trial court found that aggravated circumstances existed as to Mother. Nevertheless, the court directed that CYF provide reasonable services to reunify Mother with Child. Joint Stipulation, 8/17/17, at ¶ 13. CYF initiated a Family Service Plan (FSP) on December 29, 2016, and revised it on July 21, 2017. Mother's FSP objectives required, in part, that she obtain a drug and alcohol evaluation and follow through with all recommendations; cooperate with random drug testing; and schedule and attend a psychological evaluation and follow through with all recommendations. In addition, Mother was required to cooperate with the Pressley Ridge service providers, which commenced work with her in May of 2017, with respect to her parenting skills, mental health, and assisting her with making her house suitable for Child. Mother was also required to maintain appropriate and safe housing, and to participate in supervised visitation with Child. Certified Docket, #12, at Agency Exhibits #1, #4.

On May 22, 2017, CYF filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). On the same date, CYF filed a petition to change Child's goal from

---

[4] The third child lives with the child's father. Mother's Brief at 8.

reunification to adoption. A combined hearing on the petitions occurred on August 23, 2017. CYF presented the testimony of the following witnesses: Jessica Trone, probation officer;[5] Michelle Rau, Families United Network, Inc. drug and alcohol monitor; Catherine Kelly, Pressley Ridge in-home family therapist; Lajadah Freeland, Pressley Ridge family advocate; Jana Miller, early intervention service coordinator; and Bryna Smith, CYF caseworker. Mother testified on her own behalf.

By decree dated August 25, 2017, and entered on August 28, 2017, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (b).[6] By order dated August 25, 2017, and entered on August 29, 2017, the trial court changed Child's goal to adoption. On September 22, 2017, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P.

---

[5] Ms. Trone testified that Mother was currently on probation for crimes involving driving under the influence and unsworn falsifications. N.T., 8/23/17, at 20. On August 21, 2017, two days before the subject proceedings, Mother participated in a probation violation hearing, which resulted in a six-month extension on her probation related to her conviction for driving under the influence. *Id.* at 21. At a minimum, Mother's total probation sentence would expire in eight months from the date of the subject proceedings. *Id.* at 23.

[6] By decree entered on October 30, 2017, the orphans' court involuntarily terminated the parental rights of Child's father, Q.W. ("Father"). Father did not file a notice of appeal.

- 4 -

1925(a)(2)(i) and (b).[7] The trial court filed a Rule 1925(a) opinion on October

16, 2017.

On appeal, Mother presents the following issues for our review:

I. Whether the trial court erred in changing the goal from reunification to adoption[?]

II. Whether the trial court erred in concluding that termination of parental rights would best serve the needs and welfare of the Child pursuant to Section 2511(b) of the Adoption Act[?]

III. Whether the trial court erred as a matter of law in terminating the parental rights of [Mother] in light of the progress [Mother] made on the goals in the limited time set by [CYF][?]

Mother's Brief at 7 (unnecessary capitalization omitted).

We review Mother's issue regarding the goal change order for an abuse

of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Section 6351(f)

of the Juvenile Act provides as follows, in relevant part.

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

---

[7] On September 22, 2017, Mother filed amended notices of appeal with respect to both the involuntary termination decree and the goal change order where she revised the dates they were issued and docketed.

- 5 -

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to . . . preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child. . . .

. . .

42 Pa.C.S. § 6351(f)(1)-(6), (9). "These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (citation omitted). "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id.* (citation omitted) (emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009).

In her appellate brief, Mother has failed to set forth any citation to legal authority relevant to her argument that the trial court erred in changing Child's placement goal from reunification to adoption. Therefore, Mother has waived this issue. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating

that issues are waived if appellate brief fails to provide meaningful discussion with citation to relevant authority); *see also* Pa.R.A.P. 2119(b).

Even if Mother's issue was not waived, we would conclude that it is without merit. On August 11, 2017, less than two weeks before the subject proceedings, Mother tested positive for marijuana. N.T., 8/23/17, at 21. She acknowledged that she continues to use both marijuana and alcohol to cope with stress. *Id.* at 35-36.

With respect to her FSP objectives, Bryna Smith, the CYF caseworker, testified that Mother is in moderate compliance, but she has made minimal progress in meeting her housing and mental health goals. *Id.* at 99-100. Regarding housing, Ms. Smith testified, in part, that Mother has a history of numerous people going in and out of her home. *Id.* at 102. Ms. Smith explained on direct examination as follows:

> [W]e have conversations about traffic going in and out of her house and things going missing,[8] her not following through with evicting the roommate that she has, as well as most recently her making the impulsive decision to move someone else into her home. I was not aware that she moved someone else into her home until today.[9] And those are all decisions that would affect the safety of her child should these people not be safe. I don't know if they have criminal charges. Her roommate's son is on probation. . . .

---

[8] Ms. Smith testified that Mother informed the Pressley Ridge team that her psychotropic medication had been stolen. N.T., 8/23/17, at 101; *see also* N.T., 8/23/17, at 61.

[9] The record reveals that Mother has a new boyfriend who resides with her. N.T., 8/23/17, at 58-59.

*Id.* at 101.

In addition to Mother's house being unsafe, Catherine Kelly, the Pressley Ridge in-home family therapist, testified that Mother's visits with Child would remain supervised into the foreseeable future because she has not demonstrated an ability to consistently address Child's medical needs. *Id.* at 44. Child suffers from muscle tightness and receives physical therapy weekly in both the foster home and during supervised visits with Mother. *Id.* at 88-91. In addition, Child may have swallowing difficulties and be in need of future speech therapy. *Id.* at 116. Mother has attended Child's medical appointments, but Ms. Smith testified, "it was an ongoing concern that she was not focusing on what was being said during the medical appointments." *Id.* at 121.

Jana Miller, the early intervention service coordinator, testified that Child receives physical therapy weekly, and that the physical therapist teaches both the foster mother and Mother how to perform the exercises on Child. *Id.* at 89-90. With respect to Child's immediate need for physical therapy as it relates to his future health, Ms. Miller testified on direct examination:

> Q. [D]oes it appear as if [Child is] going to need these services in the foreseeable future?
>
> A. Yes.
>
> Q. What if [Child] does not receive these services? How will it impact him?

A. It would probably impact him significantly. He demonstrates a good bit of muscle tightness on one side of his body, so it would affect his ability to learn to crawl effectively and walk and . . . everything from there on.

Q. So it is crucial at this point in time that these services be deployed for the child to try to get him in a position where he can be in a more regular developmental stage?

A. Yes, absolutely.

*Id.* at 91. Upon review, there is no record evidence that Mother will provide this crucial and immediate care to Child based on her mental health and the conditions in her home. The totality of the record evidence demonstrates that changing the placement goal to adoption is in Child's best interest. Accordingly, we affirm the goal change order.

Turning to Mother's issues regarding the involuntary termination decree, we review them according to the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

- 9 -

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party
> seeking termination must prove by clear and convincing evidence
> that the parent's conduct satisfies the statutory grounds for
> termination delineated in Section 2511(a). Only if the court
> determines that the parent's conduct warrants termination of his
> or her parental rights does the court engage in the second part of
> the analysis pursuant to Section 2511(b): determination of the
> needs and welfare of the child under the standard of best interests
> of the child. One major aspect of the needs and welfare analysis
> concerns the nature and status of the emotional bond between
> parent and child, with close attention paid to the effect on the child
> of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of

Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re*

*B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we

conclude that the certified record supports the decree pursuant to Section

2511(a)(5) and (b), which provides as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child
> may be terminated after a petition filed on any of the following
> grounds:
>
> . . .
>
> (5) The child has been removed from the care of the parent
> by the court or under a voluntary agreement with an
> agency for a period of at least six months, the conditions
> which led to the removal or placement of the child continue
> to exist, the parent cannot or will not remedy those
> conditions within a reasonable period of time, the services
> or assistance reasonably available to the parent are not
> likely to remedy the conditions which led to the removal or
> placement of the child within a reasonable period of time

and termination of the parental rights would best serve the
needs and welfare of the child.

. . .

**(b) Other considerations**.--The court in terminating the rights
of a parent shall give primary consideration to the developmental,
physical and emotional needs and welfare of the child. The rights
of a parent shall not be terminated solely on the basis of
environmental factors such as inadequate housing, furnishings,
income, clothing and medical care if found to be beyond the
control of the parent. With respect to any petition filed pursuant
to subsection (a)(1), (6) or (8), the court shall not consider any
efforts by the parent to remedy the conditions described therein
which are first initiated subsequent to the giving of notice of the
filing of the petition.

23 Pa.C.S. § 2511(a)(5), (b).

This Court has stated that to satisfy the requirements of Section
2511(a)(5), the moving party must produce clear and convincing evidence of
the following elements: (1) the child has been removed from parental care
for at least six months; (2) the conditions which led to the child's removal or
placement continue to exist; (3) the parents cannot or will not remedy the
conditions which led to removal or placement within a reasonable period of
time; (4) the services reasonably available to the parents are unlikely to
remedy the conditions which led to removal or placement within a reasonable
period of time; and (5) termination of parental rights would best serve the
needs and welfare of the child. ***See In re Adoption of M.E.P.***, 825 A.2d
1266, 1273-1274 (Pa. Super. 2003).

With respect to Section 2511(b), this Court has stated that,
"[i]ntangibles such as love, comfort, security, and stability are involved in the

- 11 -

inquiry into the needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

On appeal, Mother argues that her conduct did not warrant termination because she has worked on her FSP goals. Further, Mother asserts that she "has done what was asked of her." Mother's Brief at 35. We disagree.

The trial court reasoned on the record in open court with respect to Section 2511(a):

> [T]he [c]ourt has continued concerns regarding parenting and housing. The supervisors of [M]other's visits still have some substantial concerns even during the time that [M]other's visits are supervised such that she has not moved to any unsupervised time. The [c]ourt doubts that she will be able to move to unsupervised time, let alone an ability to parent, within a reasonable timeframe.
>
> Concerns raised were [M]other not supporting the neck of the child appropriately, failing to make a connection between wipes, creams, and skin sensitivities of the child, and other basic judgment calls that a normal parent would need to make in an unsupervised setting. Essentially it establishes a pattern that [M]other needs a high level of supervision in order to address the basic needs of the child.

With regard to housing, [M]other did not dispute that she received an inheritance of approximately $19,000. She has tried to use some money to address some of the concerns, but her ability to do so seems haphazard and spotty. She may be hyperfocusing on some issues while not addressing others.

Additionally, the [c]ourt has some concerns that [M]other may be taken advantage of by some of the other individuals in her home . . ., given that she has a house and the financial resources and probably has a good heart and is trying to do her best to care for them, but it has resulted in a situation where she has not been focused where she needs to be on what she needs to do in order to create an appropriate environment for the child.

. . .

The [c]ourt specifically asked the team working with [M]other whether [M]other would be able to address her parenting concerns in a reasonable period of time, and the belief is that she will not be able to do so. Additionally, significant housing concerns continue. The [c]ourt made a point that we are not concerned about the cosmetics of the home, but things like the railing on the porch, covers on electrical outlets, fleas in the home, feces on the floor, are all particularly relevant to a home appropriate for a nine-month-old.

N.T., 8/23/17, at 4-7.

The testimony of Ms. Smith, the CYF caseworker, and the Pressley Ridge team, Catherine Kelly and Lajadah Freeland, supports the court's findings. With respect to housing, Mother indicated that she owns her house. N.T., 8/23/17, at 46. At the time of Child's placement, Ms. Smith observed Mother's house to have structural defects in the front porch and first floor bathroom that included, but was not limited to, water damage, and potential mold as a result. She saw dog feces in the dining area, which looked old, not fresh, and moldy food on the kitchen table. *Id.* at 106-107, 110. Moreover, Ms. Smith

- 13 -

described the condition of Mother's basement, as well as the flea infestation

in the house, as follows.

> I went to the basement . . . . [T]here was a large pool of water
> and wood chips in the basement housing several cats. So when I
> went down the stairs, you could smell the cat smell, but the cats
> weren't down there. Got to the bottom of the steps, there was a
> large clear tarp with cat litter [o]n it, not a litter pan. . . .
>
> I looked around to see where the water was coming from. It was
> actually coming directly out of the water meter. . . . I felt
> something on my foot, so I went to brush it. I thought it was a
> spider. My legs were literally covered to about an inch above my
> ankle in fleas. . . . My feet were black covered in fleas.

*Id.* at 107-108.

Ms. Smith testified that, by the time of the subject proceedings, Mother

had replaced the front porch, but there was no railing around the porch, "which

would be a safety concern for a young child [who would] be able to fall because

it is a considerable drop from the porch." N.T., 8/23/17, at 106. In addition,

Ms. Kelly testified that there was a water leak in the basement, and she was

concerned that mold remained in the house. *Id.* at 48, 50. Ms. Kelly also

testified, "There are animals in the home that . . . go to the bathroom on the

floor." *Id.* at 49. Ms. Freeland testified that the flea infestation remained.

*Id.* at 74, 85.

As referenced above, there was an additional safety concern regarding

Mother's home testified to by Ms. Kelly as follows:

> There's also additional people living in the home that we've talked
> to [Mother] on several occasions about having them evicted from
> the house, and she hasn't followed through on that. The woman
> [living in Mother's house] has a son, a teenage son, who is

currently on Juvenile Probation that [Mother] has expressed concerns regarding him using marijuana in the house and stealing from her and allowing friends into the house without her knowledge.

. . . I was at her house last week. We were sitting in the house in the living room having a discussion, and there was a noise upstairs, and at first she didn't recall who else was in the home. She didn't think anyone else was home, but here she had allowed some friends to stay over. So her decision-making, especially when it comes to her safety and [Child's] safety, is a concern.

*Id.* at 56-57.

With respect to Mother's parenting skills, Ms. Kelly, who supervised Mother's visits with Child, testified that Mother did not follow the restrictions regarding Child's diet as well as diaper and baby wipe brands, necessitated by Child's allergies. N.T., 8/23/17, at 37-40. Ms. Kelly testified that Mother would bring to the visits her own food and products for Child rather than use what the foster mother provided for Child during the visits. *Id.* at 38-39. Ms. Kelly described an incident where Mother used Aveeno cream on Child during a visit. She stated that as a result of the Aveeno cream, Child "broke out in a very severe rash. He almost looked like he had a chemical burn. He was very red. He had puss coming out different places where the skin was kind of peeling off." *Id.* at 37. Ms. Kelly explained that Mother "was aware she was not supposed to use the Aveeno cream. . . ." *Id.* at 38. Ms. Kelly testified she has not seen any improvement in Mother's parenting skills. *Id.* at 68. Specifically, on inquiry by the trial court, Ms. Kelly explained that Mother

continued to struggle with her sobriety and her ability "to follow a schedule based on [Child's] needs and not just her own personal needs." *Id.* at 70

Based on the foregoing, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to Section 2511(a)(5). Child was removed from Mother at birth in November of 2016, a period of nearly nine months on the date of the decree. The conditions which led to Child's removal continue to exist; namely, Mother has acknowledged her continuing marijuana and alcohol use to help her cope with stress. *Id.* at 35-36. In addition, she maintains an unsafe house for Child. As such, Mother has not remedied these conditions within a reasonable time, and the services available to her are unlikely to remedy them within a reasonable time period. Finally, the termination of Mother's parental rights would best serve the needs and welfare of Child, particularly in light of his developmental and physical needs, and Mother's lack of focus during Child's medical appointments, as well as her lack of compliance with his medical restrictions concerning diet and other items that may trigger allergic reactions.

With respect to Section 2511(b), Mother claims that the court abused its discretion because she "has a strong emotional bond with" Child. Mother's Brief at 31. We discern no abuse of discretion. We are governed by the following settled case law:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The
> mere existence of an emotional bond does not preclude the
> termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.
> Super. 2008) (trial court's decision to terminate parents' parental
> rights was affirmed where court balanced strong emotional bond
> against parents' inability to serve needs of child). Rather, the
> orphans' court must examine the status of the bond to determine
> whether its termination "would destroy an existing, necessary and
> beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387,
> 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d
> 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can
> > equally emphasize the safety needs of the child, and should
> > also consider the intangibles, such as the love, comfort,
> > security, and stability the child might have with the foster
> > parent. Additionally, this Court stated that the trial court
> > should consider the importance of continuity of
> > relationships and whether any existing parent-child bond
> > can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

The record reveals that Mother's supervised visits occurred three times per week, for a total of four hours per week. N.T., 8/23/17, at 40. She

consistently attended her scheduled visits. *Id.* Mother testified on direct

examination, in part:

> The bond that me and [Child] have, we have that connection
> where he sees me, he's very happy. . . . I will put my hands out,
> and he will put his arms up, like . . . wanting . . . . to get carried
> up. He does his little hugs. Like, he'll snuggle up on me, look me
> in the eyes, mimic everything that I do.

*Id.* at 144.

Nevertheless, Ms. Smith, who has participated in supervised visits with

Mother, and makes monthly visits to Child in his foster home, testified that

Child is more strongly bonded to his foster parents than to Mother. *Id.* at

114. She specifically observed that Child appears to interact more naturally

with his foster mother than with Mother, and that he always appears "very

happy, engaged" in the foster home. *Id.*

Upon careful review, there is no record evidence that terminating

Mother's parental rights would have a detrimental effect on Child. Rather, the

testimonial evidence reveals that terminating her parental rights would serve

Child's developmental, physical, and emotional needs and welfare pursuant to

Section 2511(b). Accordingly, we affirm the decree pursuant to 23 Pa.C.S. §

2511(a)(5) and (b).

Decree affirmed.  Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/22/2018